(83 N. W. Rep. 519.)

*In re* SIMPSON.

Opinion filed August 27, 1900.

### Disbarment of Attorneys—Accusing Affidavits.

In disbarment proceedings, the contents of affidavits which have been filed as a basis for commencing such proceedings cannot be considered as evidence in support of the accusations upon the trial of the issues of fact. The accused has a right to be tried upon the evidence of witnesses who have been cross-examined or an opportunity given to do so.

### Embezzlement.

An attorney who receives money for his client and without the knowledge, consent or authority of such client loans such money to a third person for his own benefit, is guilty of embezzlement under section 7464, Revised Codes, and such offense constitutes grounds for disbarment under subdivision 1 of section 433, Revised Codes.

### Deceit.

Where an attorney settles an account upon which a suit is pending and receives payment on such settlement and thereafter conceals from his client the fact that the money has been paid and account settled, and continues his prosecution of the case at his client's expense, such act is a deceit practiced upon a party to an action and is an express ground for disbarment under section 428, Revised Codes.

### Ground for Disbarment—Fraudulent Concealment of Facts.

Such acts are also violations of his duty as an attorney as laid down in subdivisions 2 and 6 of section 427, Revised Codes, and constitute grounds for disbarment under subdivision 3 of section 433, Revised Codes.

### States Attorney—Willful Omission to Prosecute.

The duties of an attorney in this state, who is also state's attorney, as to the enforcement of the laws relating to the sale of intoxicating liquors are found in part in section 7604, Revised Codes, which requires state's attorneys to diligently prosecute any and all violations of such law and makes the neglect or failure to do so a misdemeanor punishable by both fine and imprisonment and forfeiture of office. Such misdemeanor involves moral turpitude and is also a statutory ground for disbarment under subdivision 1 of section 433, Revised Codes.

### Defendant's License Revoked.

It is found under the evidence in this case that the accused in his capacity as an attorney at law committed the several offenses above referred to and his license to practice in the courts of this state is accordingly revoked and annulled.

**Supreme Court Has Authority to Disbar.**

> The Supreme Court of this state, being clothed with the power to admit attorneys to practice has as an incidental and inherent power the right to suspend and disbar them from practice for unprofessional conduct, and section 432, Revised Codes, which purports to create such power in this court is merely a legislative affirmance of a power which already existed.

An original proceeding for the disbarment of Leslie A. Simpson, an attorney at law. The proofs were taken before a referee appointed by the court for the purpose. Upon the evidence reported, the accused was found guilty of conduct unbecoming an attorney and disbarred.

*Newton & Smith, James G. Campbell* and *J. H. Field,* for the accusers.

By Sec. 96 Const. only judicial powers can be imposed upon the Supreme Court or any of its judges. Both the admission and the removal of attorneys are judicial acts. *Ex parte Secombe,* 19 How. 9, 60 U. S. 565; *Ex parte Garland,* 4 Wall. 378, 71 U. S. 370; *Randall* v. *Brigham,* 7 Wall. 523, 19 L. Ed. 285-291; *Case of Henry W. Cooper,* 22 N. Y. 67. Jurisdiction is a power conferred on a court by constitution or statute to take cognizance of the subject matter of a litigation and the parties brought before it, and legally hear, try and determine the issues and render judgment according to the general rules of law upon the issues joined by them, either of law or of fact, or of both. Brown on Jurisdiction, 1. At common law all courts of general jurisdiction had power to suspend or disbar attorneys practicing before them. The authority still exists independent of statute. 6 Enc. Pl. & Pr. 710, note 5. In Professor Dwight's argument, 11 Abbott's Pr., 306-25, abbreviated in *Cooper's Case,* 22 N. Y. 69, it is contended that at common law the court had no power to appoint an attorney or counselor. See, also, opinion at page 90 where the court says, "Barristers or counselors at law in England were never appointed by the courts of Westminster, but were called to the bar by the inns of court, which were voluntary, unincorporated associations. The power to appoint attorneys as a class of public officers was conferred originally, and has been from time to time regulated and controlled in England by statute." In the United States the subject has been largely controlled by legislative enactment, although courts have sometimes questioned the power of the legislature in the premises. Opinion of Ryan, C. J., *In re Goodell,* 39 Wis. 232-239. In the absence of a law or custom conferring the privilege upon some other body or official, all courts possess the power inherently, of saying who shall practice as attorneys before them. The power to say who may practice as an attorney carries with it the power to say who may not. 3 Am. & Eng. Enc. L. (2d Ed.) 300, note 5; *Brooks* v. *Fleming,* 6 Bax. (Tenn.) 337. Authority to disbar is possessed exclusively by the tribunal authorized to grant licenses admitting to the profession. *People* v. *Green,* 7 Col. 244, 1 Am. & Eng. Enc. L. (1st Ed.) 944; *Cohan* v. *Wright,*

22 Cal. 293; *State* v. *Kirke,* 12 Fla. 278, 95 Am. Dec. 304. The constitution makes no express provision for the bar, but it establishes courts amongst which it distributes all the jurisdiction of all the courts. *In re Goodell,* 39 Wis. 239, *Putnam* v. *Sweet,* 2 Pinn. 302, Const. N. D. Sec. 85. An attorney is an officer of the court in which he practices, he is not in any sense a public officer of the state or of the United States. 3 Am. & Eng. Enc. L (2d Ed.) 282, notes 1 & 2. The constitution speaks of "the office of attorney at law." Sec. 37 Const. See also his oath, Sec. 423 Rev. Codes, Sec. 211 Const. An attorney's relation to the court is called "his office as an attorney." Sec. 1, Chap. 105, page 146, Laws 1899; *Case of Austin,* 5 Rawle, 191, 28 Am. Dec. 657-661. His office as an attorney invests him with certain enumerated duties and privileges. Sec. 427-429, Rev. Codes. The admission of an attorney to practice by the court is not the exercise of the power of appointment by the judges mentioned in Sec. 96, Const. *Cooper's Case,* 22 N. Y. 94. Sec. 86 of the constitution is composed of two parts, the last clause grants a general superintending control over all inferior courts under such regulations and limitations as may be prescribed by law. *State* v. *Johnson,* 79 N. W. Rep. 1081-1086; *State* v. *Archibald,* 5 N. D. 359, 66 N. W. Rep. 234. This grant of power is unlimited in extent, indefinite in character, unsupplied with means and instrumentalities. The legislature fixes the qualifications required for admission and also determines by what acts an attorney's privileges shall be forfeited. To the Supreme Court is delegated the execution of the legislative will. Here is a regulation and limitation for the exercise of superintending control over inferior courts. Sections 420 to 426, Rev. Codes. This legislation is justified by § 86, Constitution, wherein general superintending control is given to the Supreme Court over inferior courts. The licensing of persons to practice in the courts of the state, other than the Supreme Court, is a matter fit for the Supreme Court to control. Mandamus will issue to restore an attorney in an inferior court, for the office of an attorney is necessary to the administration of justice and is of public concern. *State* v. *Kirke,* 12 Fla. 275, 95 Am. Dec. 314. If, as contended, the constitution and statute vest the Supreme Court with plenary power and jurisdiction in the matter of the admission of attorneys, it follows that this court has power to disbar. In this state only statutory causes for disbarment will be considered upon motion to that end. *In re Eaton,* 5 N. D. 514. An attorney's license may be revoked for a felony committed by him, or for a misdemeanor involving moral turpitude. Subd. 1, § 433, Rev. Codes. Also for a willful violation of any of the duties of an attorney, or counselor, as prescribed by law. Subd. 3, § 433, Rev. Codes. An attorney who receives money or property of his client's, in the course of his professional business, and who refuses to pay or deliver the same to the person entitled thereto, within a reasonable time after demand, is guilty of a misdemeanor. § 438, Rev. Codes; § 7464, Rev. Codes; § 438, Subd. 3, § 429 and Subd. 6, § 427, Rev. Codes; *Stout* v. *Proctor,* 71 Me. 288; *Baker* v. *Commonwealth,* 10

Bush. (Ky.) 592; *In re Wall,* 13 Fed. Rep 814; *In re Bowman,* 7 Mo. App. 569.

*C. E. Gregory,* (*Ball, Watson & Maclay,* of counsel), for accused.

The pending proceeding for the disbarment 'of the defendant is a special proceeding and involves the exercise by the court of original jurisdiction. If the court is clothed with the power in question, it must be derived either from some provision of the constitution or be attributable to some inherent power residing in a court without reference to constitutional or legislative enactment. Our courts are not clothed with the power and jurisdiction possessed by the courts of England at common law. All their powers, excepting such as are inherent in all courts, are derived from and are wholly dependent on the grant contained·in § § 86 and 87 of the state constitution. *People* v. *Circuit Court,* 48 N. E. Rep. 717; *People* v. *Attorney General,* 1 Cal. 85. These two sections provide that the court shall have appellate jurisdiction only, except in certain enumerated cases, and the matter of disbarment of attorneys does not fall within the list of excepted cases. There is nothing in the foundation of the Supreme Court which makes it the censor of the morals of the bar, or the guardian of the safety and dignity of the courts. In view of the grant to this court of appellate jurisdiction only, and of the fact that the offenses set forth in this case as the grounds of disbarment were not offenses committed in the presence of this court; that they concern not at all (unless in the most remote way) its dignity or self respect; do not involve its records or process, and in no manner hinders or obstructs its administration of justice, can it be said that the court has or ought to take jurisdiction. It was the intention of the legislature to preserve the right of appeal in cases of disbarment. § 437, Rev. Codes. It is expressly provided that a judgment of acquittal by the District Court shall be final. A strong implication arises from this provision that it was the intention of the legislature that disbarment proceedings should be initiated and tried in the District Court, excepting only as above stated, where it was necessary for the Supreme Court to exercise the jurisdiction as one of its inherent powers for its own protection. The following cases illustrate how sharply the line between original and appellate jurisdiction is drawn by the courts. *State* v. *Nelson County,* 1 N. D. 88; *Everett* v. *Board,* 1 S. D. 365; *In re Carothers,* 52 N. E. Rep. 742; *Ingraham* v. *Ingraham,* 49 N. E. Rep. 320; *Massey* v. *Powell,* 43 S. W. Rep. 506.

YOUNG, J. This is a disbarment proceeding prosecuted in this court against Leslie A. Simpson to revoke his license as an attorney and counselor-at-law for certain unprofessional acts alleged to have been committed by him in his capacity as an attorney. The proceedings were instituted under section 432. Revised Codes, which authorizes the Supreme Court or any District Court to revoke or suspend the license of an attorney and counselor-at-law to practice in the courts of·this state.

The history of the case is as follows: On August 16, 1899, one William Thaw Denniston, an attorney-at-law, located in Billings county, filed his affidavit in the office of the clerk of this court charging the accused with the commission of three several offenses which constitute willful violations of his duty as an attorney and counselor-at-law. This affidavit with certain exhibits was served upon the accused under the direction of this court and he was given twenty days after the service thereof in which to file his answer. On October 3, 1899, James G. Campbell and J. H. Field, attorneys located at Dickinson, North Dakota, by leave of court, joined in the Denniston charges, and also filed in addition, their joint affidavit in which they charged the accused with eight separate and additional delinquences. The accused filed a verified answer to all of such charges in which he denied each and every act charged in the accusing affidavits save as to one charge. As to this he set up certain facts by way of explanation. After issue of fact was joined, both the attorneys for the prosecution and the accused petitioned the court for the appointment of a referee to take testimony, and in accordance with such prayer, a referee was appointed, who took a portion of the testimony at Dickinson, North Dakota, where the accused and most of the witnesses reside, and reported the same to the court. A number of witnesses who were subpoenaed on behalf of the accusations refused to testify before the referee. Such refusals were reported to this court. Attachments were issued and after a hearing such witnesses were punished for their contempts. Their testimony was given in open court at the hearing of the contempt proceedings. The rest of the evidence, both on the part of the prosecution and the accused, is presented to us in the form of depositions, save that of the accused, who testified orally before the court at the final submission of the case. The record is exceedingly voluminous, embracing altogether the testimony of thirty-six witnesses, as well as considerable documentary evidence.

For the purpose of convenience in treatment we shall classify such of the charges as we shall consider in this opinion under two heads. The first relates to the conduct of the accused with reference to a certain collection which he received from a Montana client. It is charged in Denniston's affidavit that in the year 1895 the Holter Lumber Company of Great Falls, Montana, through its attorney, James Donovan, also of Great Falls, forwarded to the accused at Dickinson, North Dakota, an account for about $600 against one Lewis Christensen, of Belfield, in Stark county, for collection. That said Simpson, in violation of his duty as an attorney, and without the knowledge or consent of his client, "proposed to said Lewis Christensen to satisfy said demand for the sum of $250, to be paid by the said Lewis Christensen on account of said Holter Lumber Company, for and in consideration of said account and demand, and $50 to be paid to himself, said Leslie A. Simpson and for his own personal use, and thereupon the said sums were paid by the

said Lewis Christensen, and by said Leslie A. Simpson received, and a receipt in full for said account and demand executed by the said Leslie A. Simpson and delivered to the said Lewis Christensen." In this connection the affidavit further charges that the accused, while holding the $300 so received, as before stated, falsely and with intent to deceive his client, pretended and asserted to "his said client that said claim had not been paid or any part thereof, and that he had for the enforcement of said claim commenced an action in the District Court of said Stark county, and that said action had been referred to J. P. Folsom, Esq., J. P., of said county as referee, and that it was necessary to take depositions in proof of said claim, and that in pursuance of a notice to that end, given by the said Leslie A. Simpson as attorney for the said Holter Lumber Company, certain depositions were taken at Great Falls, Montana, in June, 1896, and returned to the said J. P. Folsom, Esq., and that thereafter on or about August 31, 1897, the said Leslie A. Simpson paid the said Holter Lumber Company through its attorney, James Donovan, Esq., the sum of $100, and thereafter the further sum of $125, and falsely and deceitfully pretended that he was unable to secure his fee from the said Lewis Christensen in addition to the said $250 and retained from the said sum $25 as his fee." The source of Denniston's information is in part twelve letters written by Simpson to his said client, which letters were attached to and made a part of his accusing affidavit.

The following affidavit of Christensen was also attached to the Denniston accusation: "State of North Dakota, County of Stark, ss. Lewis Cristensen personally appeared and being duly sworn on oath says that he is the identical Lewis Christensen against whom the Holter Lumber Company of Great Falls, Montana, some time in the year 1895, sent a claim or account to Leslie A. Simpson, Esq., an attorney-at-law located at Dickinson, North Dakota, and that the amount of said claim was, at said time, $600 or over; that some time in the summer of 1895 said Simpson saw me and said that if I would pay $250 on the account and $50 to him he would give me a receipt in full. I thereupon gave him two checks on the First National Bank of Dickinson, North Dakota, one for $250, and one for $50, and he gave me a receipt in full. L. Christensen." Verified.

On September 9, 1899, the accused filed the following verified answer to the foregoing accusation: "Answering paragraph two of said complaint, alleges that he received in the year 1895 from the Holter Lumber Company a claim amounting to $429 against one Lewis Christensen, with full written authority accompanying said claim, to settle it as his judgment dictated; alleges that pursuant to written instructions from said client suit thereon was commenced against said Lewis Christensen and process duly served by the sheriff of Stark county, North Dakota, and defendant duly appeared therein by attorney. Admits that he settled the claim for $250 and charged a fee of $25 for his services from his client, and alleges that the money so paid was forwarded to client and by it

accepted and acknowledged in writing as a satisfactory, full and complete settlement of the matter, well knowing the circumstances thereof; alleges further that at the time said claim was received as appears by the public records of Stark county, said Christensen was not worth in property the amount of said claim on execution, or any amount whatever above his debts and liabilities and property exempt on execution, and alleges that said settlement was in every way to the interest of his client, and to his ·client's satisfaction, then and now, and that in all things connected therewith he was faithful to his client's interests, which satisfaction has never been and is not now questioned by said client. Denies that he asked for or received from said Lewis Christensen as his fee, or any part thereof, in said case, the sum of $50, or any sum whatever, save as above set forth. Alleges that by an order made by the judge of the District Court of Stark county, said case was referred to A. P. Folsom, Esq., a justice of the peace of said Stark county, all ·of which he will show by a certificate of the judge of the said court, the referee appointed, the attorney appearing for the said defendant and the sheriff of Stark county at said time. Alleges that he is unable to produce the original files in said action and charges on information and belief that the said William Thaw Denniston stole them from said defendant's office while he was in charge thereof, and during defendant's absence from the state. Except as herein admitted, explained or qualified, denies each and every allegation in said paragraph two contained."

The second branch of the accusations includes numerous alleged breaches of duty on the part of the accused in relation to his duties as state's attorney under the prohibition law of this state, and covers a period of time commencing with his assumption of the office of state's attorney in January, 1897, and extending up to the present time. It is not practicable to take up the separate charges in detail. They will, therefore, be treated together. First, as to the accusations under this head: It is alleged in the Denniston affidavit that in the year 1897 one Matthew Pisha was operating a saloon in Dickinson, Stark county, and that the said Pisha, upon the understanding that he should not be prosecuted for conducting such saloon, and under the direction of the accused as state's attorney for Stark county, paid to the county treasurer of Stark county the sum of $200 for a license to sell "liquid drinks" for a period of five months, and that said Pisha sold intoxicating liquors to the personal knowledge of L. A. Simpson and was not prosecuted or molested; that thereafter the county officers of said county, except the accused, refused to issue further licenses and did not do so; that thereafter and on February 3, 1898, the accused, through one Frank Kihm, who was acting as his agent, demanded from the said Pisha the sum of $150 and threatened if the same was not paid the accused would inform against him for running a saloon; that said Pisha paid the $150 so demanded to the said Kihm and that thereafter and on May 5, 1898, in pursuance of like threats and for a like purpose

paid the said Kihm the further sum of $50 for the sole use of said Simpson for protection against prosecution in his business of selling intoxicating liquors; that the said Simpson is from time to time collecting large sums of money, to-wit: the sum of $25 per month from divers persons in Dickinson for the privilege of selling intoxicating liquor and under the threat that he would prosecute them unless such payments are made, and that said Kihm is employed in making such collections. Affiant named as some of the persons engaged in such unlawful business the following: E. J. Berry, O. B. Frankenberg, Michael McGinley, and John Leonberger. Attached to the Denniston affidavit, containing the foregoing accusations, was the affidavit of Matthew Pisha, which fully sustained the facts alleged as to him, and further alleged as follows: "That in the months of May and July, 1897, affiant (Pisha) paid money to the county treasurer of said county by direction of said L. A. Simpson and received licenses from the board of county commissioners to carry on his business; * * * that affiant is informed and believes that said L. A. Simpson received one-fourth of the sum so paid; that subsequently the said commissioners refused to issue licenses and thereafter all sums paid by affiant were paid by him to the said Kihm as agreed upon for the sole use of said L. A. Simpson."

It is alleged in the remaining charges under this head that subsequent to the refusal of the county commissioners to issue further licenses, and on or about December 29, 1897, the said L. A. Simpson made affidavits accusing Michael McGinley, Matthew Pisha, Charles Klinefelter, Sr., E. J. Berry, Frank Kihm, and Charles O'Neil with conducting places wherein intoxicating liquors were sold contrary to the laws of this state and that at the instance of said Simpson and pursuant to his request injunctions and search warrants were issued against the places operated by the persons just named, by the judge of the District Court of said county, and all of such places were closed thereunder; that thereafter and early in the year 1898 such places were reopened and the sale of intoxicating liquors continued the same as before. "That the said Michael McGinley, Matthew Pisha, Ed. Berry, Charles Klinefelter, Frank Kihm, and others and each of them, as complainants, are informed and believe, so reopened said places, and continued said business with the knowledge, consent and connivance of said Leslie A. Simpson; that the said Leslie A. Simpson thereafter failed and willfully neglected further to prosecute said cases, or any of them, against said respective defendants; and each, every and all of the papers, files and records therein, failed and willfully neglected to file or deposit in the office of the clerk of the District Court of Stark county, wherein the said actions were commenced, and then pending, and on the contrary thereof wrongfully placed the same beyond his control with the intent that they should become lost and destroyed, and that they so did, and that the said Leslie A. Simpson has heretofore failed and willfully neglected further to prosecute said actions or to enforce the bonds therein, by each of the defendants given; and that he

has so done with the intent to avoid the effects of the laws of the State of North Dakota upon the defendants and each of them, and that thereby in each of said cases, the said Leslie A. Simpson has committed a misdemeanor involving moral turpitude."

On October 13, 1899, the accused filed a verified answer denying each and every fact alleged in the foregoing charges save this: "He admits that injunctions were issued and alleges that the owners of the buildings involved in such injunctions, under the prohibition law of North Dakota, gave bond and released said buildings, thereby dismissing said injunctional proceedings as appears by the files in said proceedings."

The foregoing are the only charges which we shall consider. They are set out at some length, so that the issues of fact to be determined may be clearly understood. On account of the serious consequences which must follow a finding that the charges are true, we shall limit ourselves to the consideration of evidence that is either undisputed or does not admit of doubt.

Two questions are to be kept in view as expressing the object of this investigation: First, is the accused guilty of all or any of the acts with which he is charged? Second, if he is, are they of such a character as to clearly establish, under the circumstances of the case, that he is an unfit person to be held out by the court to the public as an attorney and counselor-at-law? It is never a pleasant task to any court to investigate and pass judgment upon the professional conduct of the members of the bar and this case is not an exception. The accused has been engaged in the practice of his profession at Dickinson, in Stark county, for more than ten years and has apparently enjoyed a lucrative practice in that and adjoining counties. He has held the office of state's attorney of his county since January 1, 1897, and has been honored with other public positions. He is a man of family and is only in the prime of life. The future should hold for him a large measure of usefulness in his profession. These considerations invoke the personal sympathy of the members of this court, but we cannot permit them to cause us to shrink from the performance of the duty cast upon us and which we owe to the public, of carefully investigating the charges presented and passing judgment upon the facts as they shall appear and according to their truth.

Before proceeding to a consideration of the evidence the preliminary question is presented whether the allegations of fact contained in the various affidavits, to which reference has been made, and also others which have not been referred to, constitute evidence to be considered by us upon the trial of the issues of fact. We are of the opinion that they do not. It is the right of the accused to have the issues determined upon the evidence of witnesses who have been subjected to cross-examination or an opportunity given to do so. The sole function of these affidavits is to furnish a basis for the commencement of the proceedings. The rule which seems most sound to us and which we shall follow is announced *In re*

*Eldridge,* 82 N. Y. 161. The court in discussing this question said: "On the application addressed in the first instance to the court as to the mode of arousing its attention and setting it in motion, affidavits, minutes of testimony, anything which furnishes needful information may be used as the basis upon which to found an order to show cause. Upon the return of that order the accused is heard. He may confess; he may explain; he may deny. If he confess the court may at once render its judgment. If he explain the court may deem the explanation sufficient or the reverse; but if he meets accusation with denial the issue thus raised is to be tried summarily by the court itself or by the referee, but nevertheless to be tried, and on that trial the accused is not to be buried under affidavits or swamped with hearsay, but is entitled to confront the witnesses or submit them to cross-examination and to invoke the protection of wise and settled rules of evidence. In adopting this conclusion we only secure to the members of the bar the common rights and ordinary privileges of the citizen."

Turning now to the matter of the collection against Christensen, we find the original itemized account in evidence as an exhibit. It is dated January 1, 1895, and shows a balance due from Christensen of $605.07. This account was transmitted to Mr. Simpson for collection early in the month of January, 1895, by the James Donovan referred to in the accusations. All the correspondence in regard to this claim was between Donovan and Simpson. Donovan kept no copies of the letters he wrote to Simpson and the latter seems to have been unable to find and produce any of the numerous letters which Donovan wrote him. It is established that the accused compromised the account with Christensen on the date named in the accusation, to-wit: July 15, 1895, and by evidence which is beyond dispute. There is written across the face of the account the following: "Settled this 15th day of July, A. D. 1895, between Lewis Christensen and L. A. Simpson, attorney for Holter Lumber Company, in full. L. A. Simpson." The prosecution showed that the writing and the signature is that of Simpson and upon his cross-examination the latter admitted that it is his writing. The prosecution also produced two checks executed by Christensen on the date of the alleged settlement and established by the evidence of the cashier of the bank on which they were drawn that they were both paid on the day on which they are dated and charged to the deposit account which Christensen carried in such bank. Following are the checks referred to:

"Dickinson, North Dakota, July 15, 1895. First National Bank of Dickinson pay L. A. Simpson or order Two Hundred Fifty and 00-100 Dollars. L. Christensen." (Endorsed on back, L. A. Simpson).

"Dickinson, North Dakota, July 15, 1895. First National Bank of Dickinson pay Lewis Christensen or bearer Fifty and 00-100 Dollars. L. Christensen." (Endorsed on back, L. Christensen).

There is evidence in the record tending to show that the written

portions of both checks, aside from Christensen's signature, are in Simpson's handwriting. When the accused was upon the stand testifying in his own defense he admitted that he received the $250 check but did not testify as to the $50 check. Neither did he contradict the evidence that the body of both checks was in his handwriting. This is significant in view of the fact that both checks bear the same date and were cashed on the same day, and upon the very day the accused receipted the account. Thirteen letters written by Simpson, or under his direction, and addressed and mailed to James Donovan in reference to this collection were introduced by the prosecution. We deem them so decisive that we set them out in full. Omitting the address and business card they are as follows:

"Dickinson, N. D., Jan. 26, 1896. Dear Sir: Your letter of the 22nd to Mr. Simpson, who is absent attending court in Bismarck, is received; relating to the claim Holter Lum. Com. this claim was put in action last summer and is still pending. I would suppose it would come up at the next term of court,—1st Tuesday in April. I think that we want the name of a notary public in your city to take depositions before as it will probably be necessary unless the case is settled. No attachment was issued as his property was incumbered by mortgage which would have come in ahead and he was hardly likely to try and dispose of it, while mortgaged. You had better send Mr. Simpson the name of the notary public, unless you have already done so as he will want to take the deps. some time before court. Yours Truly, L. A. Simpson, per R. M. S."

"Dickinson, N. D., March 16, 1896. Dear Sir: Have received no reply to my inquiry of recent date relative to the name of some notary in your city before whom depositions can be taken. Please send me also name of book-keeper for the plaintiff, client. Our term of court has been continued until May 4th and will not convene at the regular (April 7,) time. The defendant is well mortgaged up but think it should be put in judgment. Yours Truly, L. A. Simpson."

"Dickinson, N. D., April 20, 1896. My Dear Sir: I have just returned this morning having been absent since a week ago Sunday (12th) and get your letter. I will get out my notices today and will fix a date some time between now and the 2nd of May and will write you the date and send papers. I cannot get my fee besides the $250 if he accepts the offer as that is not included; but I can take care of the costs as they will not be large. I shall see him right away tomorrow or the next day. If settled we can stop the taking of depositions, but will be ready for them in any event. I did not get this letter off in time for the fast train but think it will reach you nearly as soon. The papers will indicate the issue so that there will be no trouble in taking the evidence. Yours Truly, L. A. Simpson."

"Dickinson, N. D., April 25, 1896. My Dear Sir: I have given the debtor in the lumber company case an extension of time until

the 10th of May in which to fix the matter up on the terms I agreed with him (to be cash at that time) and which I wrote to you. I have not therefore served the Not. to take Dep. as it will not now be necessary. There is no doubt but what he will meet the terms. I consider this a very good settlement under all the circumstances as a judgment would be very, very doubtful property by reason of his being so mortgaged and his exemptions allowed under our laws. If you can I wish you would find the address of his partner while in Gt. Falls and I can get you a note for collection against him. He is supposed to be in the vicinity of your city. Yours Truly, L. A. Simpson."

"Dickinson, N. D., May 14, 1896. My Dear Sir: Yours Recd. about the Amt. of my fee in the Christensen case. Should have answered before but have been constantly in court since the 4th. Think the term will close by Saturday. I have been unable to get to Christensen yet as I could not get away and he is absent from home so his son states on the range in a cattle round up. I shall see him as soon as court closes. About the fee. I want to make it satisfactory and to make it enough so as to allow you the usual part. What do you consider will be fair and satisfactory to the client? They should make it liberal as we are 'picking up' the amount for them as it could not be recovered in my opinion on Exec. unless we had to wait a long time. Will be glad of your idea of the amount. Yours truly, L. A. Simpson."

"Dickinson, N. D., May 27, '96. My Dear Sir: Re—Holter L. Co. v. Christensen. Will the 11th of June suit you for the deposition? If not write me what date—it cannot be more than a day or two before that, as there will be too little time. If no settlement between now and day of deposition we will go on with it and take judgment. Think perhaps presence of deposition may push a little the settlement, as I am satisfied he is in good faith in making the offer. Awaiting your early reply, I remain, Yours truly, L. A. Simpson."

"Dickinson, N. D., June 10, 1896. My Dear Sir: Enclosed herewith is Notice to take Dep. and my office copy of the complaint in Holter Lum. Co. matter. The notice is the original and should be attached to the deposition in sending same in. The complaint is my office copy and should be returned to me after the taking of the Dep. Please send the Dep. to A. P. Folsom, Esq., J. P., Referee, Dickinson, Stark County, No. Dakota. Yours truly, L. A. Simpson."

"Dickinson, N. D., June 30, 1896. My Dear Sir: The Depositions have arrived all right. I was up to look them over yesterday and so far as the testimony goes they are satisfactory and in my opinion establish the issue. If the certificate of the Notary is all right, and I have no doubt that it is, the Deps. are entirely satisfactory. I shall look it over today. We have to give 8 days notice of the hearing of the case and I shall go ahead with it at that time unless something is done. Yours Truly, L. A. Simpson."

"Dickinson, N. D., Jan. 14, 1897. My Dear Sir: In answer to

yours of recent date relative to the matter therein referred to will state that the matter is still pending with the Referee. The understanding is that the matter will be adjusted before the term of court on the basis agreed (Referee's fees to be paid) and that it will not be submitted to the court. Yours truly, L. A. Simpson."

"Dickinson, N. D., April 17, 1897. My Dear Sir: In Re H. L. C.—Christensen. Your letter received. This matter has been let to drag because of the futileness of an execution and I told Deft's attorney and him as well what I would take in cash and the same has been being promised all the time. I shall take judgment (which I am in shape to do) not later than the first of May unless the cash is forthcoming. I will at once then issue execution. It will probably bring the cash promised in settlement in order to avoid trouble of levy and claiming of exemptions. I will write you not later than May 3, whether I have taken judgment or settled. Yours Truly, L. A. Simpson."

"Dickinson, N. D., June 15, 1897. My Dear Sir: I have an order for judgment and will have same entered at once and proceed by execution against debtor. I think it will bring him to time, and will report our progress within next two weeks. Resp. L. A. Simpson."

"Dickinson, N. D., August 31st, 1897. My Dear Sir: On my return from a three weeks' trip in the Yellowstone Park I found your letter and wired you the same day but was answered that you was out of town and would not return until last of month. I enclose you $100 from Christensen. The reason I have not filed papers with clerk is because I wanted to save the $5.50 clerk fees. I wrote you a long time since that I had settled the case for $250 and on payment of the money I do not feel like going back on the agreement. I was on the ground and considered this a good settlement and exercised my best judgment as you authorized me to do when you sent claim and by subsequent letters. I will get costs (except my fee) which will be satisfactory to you and will insist on balance of money this week and remit to you. The original files are in the hands of the referee appointed and have not been filed in the clerk's office. Yours Resp'y, L. A. Simpson."

"Dickinson, N. D., Sep. 15, 1897. Dear Sir: In answer to your recent letter re Christensen will state as I wrote you a long time ago that I settled this claim for $250.00 which was a good settlement as debtor was not worth anything above exemption. In this state exemption are homestead of value $5,000 absolute exemption which includes more than the average man here has, and above all this $1,500 in cash or property. It was and is of my judgment and of my knowledge that I would not make the claim by exemption and if you have been informed otherwise you are erroneously informed. I deduct $25 for my fee and enclose check to balance. I had your permission to settle the matter as my judgment dictated and acted upon it and you must have overlooked correspondence as in two letters you refer to the $250 when I wrote you that it was

agreed to settle for that sum but it was not then paid. My fee is very low as you must admit. I had long ago agreed with debtor to settle for that and could not back out after agreement and released him in full on condition of his payment which has been accepted by me. The costs are paid by debtor. Yours truly, L. A. Simpson."

We forbear commenting on these letters further than to say that they furnish conclusive proof of a most flagrant deception practiced by the accused upon his client concerning the very subject of his employment and kept up for more than two years. It is now known that Christensen settled the account with, the accused on July 15, 1895, and that whatever the sum which was paid by Christensen it was paid on that date. The defendant admits that he received $250. All of the above letters were written by Simpson after that date. But these letters do not tell the entire story. The accused filed his verified answer to the accusation now under consideration, alleging in reference to the Christensen suit "that by an order made by the judge of the District Court of Stark County, said case was referred to A. P. Folsom, Esq., a justice of the peace of said Stark county, all of which he will show by a certificate of the judge of said court, the referee appointed, the attorney appearing for said defendant and the sheriff of Stark county at said time." Had the foregoing promises been kept by the accused and such facts been shown they would only have established a higher degree of deception practiced by the accused upon his client. But the promises of his answer were not kept. A. P. Folsom, the alleged referee, was on the stand. He testifies that he never qualified or acted as referee; that he never saw an order appointing him referee; that he was not notified that he was appointed and has no knowledge that he ever was appointed. He does say, however, that some time in 1896 he received a large letter through the mail from Montana which he opened in the post-office, and noticed that it contained certain papers relative to a suit by a Montana Lumber Company against Mr. Christensen; that he met Simpson in the post-office while he had the letter in his hand and at the request of Simpson went at once to the latter's office and turned over to him all the papers he had just received and has not seen them since. The judge of the District Court was called as a witness for the accused and testified as to his legal ability and general reputation as an attorney. The accused was present at the examination but did not see fit to interrogate him as to the alleged order appointing Folsom as referee or the alleged order for judgment, or as to any facts relative to the Christensen case. This omission to supply the promised facts when the opportunity existed to do so, and the judge was on the stand as his witness, was not, we think, accidental. It is significant and strong negative evidence at least that the judge had no knowledge of such orders and that no such orders were in fact made, and the same may be said of the failure of the accused to procure the evidence of A. J. Brunelle, the alleged attorney for Christensen, or to explain why he had not done so. The records of the clerk of

the District Court of Stark county contain no records of such a case. No papers of any kind have found their way into the record before us. The deposition which the accused caused to be taken in 1896 and sent to Folsom appears to have been lost. The explanation for his delay in obeying instructions, contained in the letter of January 14th, 1897, that the case was still pending before the referee, and the further statement in his letter of August 31st, 1897, that the files were then in the hands of the referee are shown to be entirely untrue.

This was substantially the state of the evidence on the charge we are now considering when the accused took the stand in his own behalf just before the arguments were made. He testified by way of explanation of this transaction in this language: "It has been a long time since I received that collection and I do not know that I can recall all the facts in the case. My recollection is that I received the claim in January, 1895, while I was absent at Bismarck attending the session of the legislature. I think that perhaps I did not see Mr. Christensen until after the legislature adjourned. That is my best recollection. I wrote him, however, in reference to the claim and I cannot say whether I received any answer or not at this time. The collection came to me from a Mr. Donovan, a lawyer at Great Falls, Montana, with a letter accompanying the claim. I was advised to bring suit and attach the property of Mr. Christensen.* * * I knew him quite well at that time but made further investigation as to his condition. * * * I was authorized in that letter to adopt such measures as my judgment dictated for the settlement of the claim. It was not paid, and in April and May, I am not clear as to the date, in 1895, or perhaps earlier than that, I drew up papers and saw Mr. Christensen, and he told me that he had paid this claim to the book-keeper of the Great Falls Lumber Company in Montana. I told him if that was a fact to produce a receipt and I would take no further proceedings, and I wrote that statement to Mr. Donovan I think. * * * He never produced the receipt and I turned the papers over to the sheriff of Stark county for service. * * * He made a return of the papers, and subsequently Mr. A. J. Brunelle, an attorney in Dickinson at that time, appeared in the action for Mr. Christensen. No papers were filed. Mr. Christensen saw me several times and agreed to pay me, and some time in 1895, the exact date I do not remember, but in 1895, I agreed with Mr. Christensen to settle that claim for $250. He gave me his check for it on the First National Bank of Dickinson. Now that very same day, if my memory is right, and I want to state to the court that I am not entirely free from wrong in that matter, I let Mr. Christensen have $150 of that money; that very same day he told me he had imperative need for it and I let him have it; at least he paid me $100. This check was given on the First National Bank of Dickinson and I presume I cashed it, although I am not clear on that point. It is possible that I gave the

check to Mr. Christensen and he gave me $100. He was to pay it back in a few days. I let it go. He never did pay it and I kept the $100 waiting for this money, $150, and I subsequently sent the balance when he did pay it, to the attorney at Great Falls, Mr. Donovan."

We are embarrassed to some extent in our efforts to ascertain the true facts of this transaction by the absence of Christensen's evidence. The record shows that the prosecution made diligent and repeated efforts to procure it, but were thwarted in their efforts to do so. No effort has been made by the accused to procure Christensen's testimony, neither has he expressed a desire to do so. At the final submission of the case, however, the accused filed an ex parte affidavit purporting to have been signed and verified by Christensen on October 2, 1899, at Dickinson. This was offered for the purpose of contradicting his former affidavit attached to the accusation and before set out. We have examined this second affidavit with care, and while it is skillfully drawn, we do not find that it contradicts or is inconsistent with the original affidavit or the evidence offered by the prosecution. As has been stated, however, affidavits cannot be used as evidence upon the issues on trial and it is referred to only for the purpose of showing that the accused could have secured Christensen's testimony if he had desired to do so. Under these circumstances the presumption is that his testimony would have been unfavorable to the accused. But conceding the truth of everything contained in the explanation of the accused, it is an explanation which, in our judgment, does not remove to any degree his guilt as charged in the moving affidavit, save only as to the receipt of the extra $50. He admits that he received $250 on July 15, 1895. His letters show that he did not remit it until August and September, 1897, and the fact that he had collected it was studiously concealed during all of this time. Neither do the surrounding facts lend any corroboration to the statement that he lent $150 of this money to Christensen. Everything is against it. First, Christensen does not seem to have had occasion to borrow. He had a bank account of his own at the time. How large it was does not appear, but it is shown that he drew two checks on it—one for $250 and one for $50, on the very day the account was settled, and that such checks were paid. Second, on the statement of the accused, as a business proposition, it does not seem reasonable to us that a man of Mr. Simpson's intelligence would hand over $150 in cash as a loan without security, and from money which was not his own, to a man who he claims was to his knowledge at that time financially irresponsible and against whom he had just settled a $600 claim for only $250. In connection with Simpson's explanations we cannot overlook the evidence of one Frank Stone, a witness for the accused. After testifying that he was a deputy sheriff in Stark county in 1895, and that some time in that year he received a summons and complaint for service from Simpson against Lewis Christensen in a case wherein the Holter Lumber Company was plaintiff, and that he

served such papers, he was interrogated by Mr. Simpson as follows:

"Q. State whether or not you saw him afterwards and had a conversation with him with reference to the same suit some time in 1897? A. I did. Q. Did he say anything to you with reference to that suit at that time? A. Yes sir. Q. State what it was. A. He said he had settled it. Q. Did he state how much he settled for? A. He said he settled it for $300. Q. Are you sure about $300? Did he say how many payments he had settled it in? A. He said he settled it. Q. What were the amounts of those payments? A. I think if my memory serves me right he said he had made two payments and that one of the payments he had made then and he had time on the other one. Q. Are you sure he said $300? A. I won't be positive but I think he said $300. Q. Did you not tell me that he stated he had paid that bill in two payments, one for $100 and one for $150. A. He said he had paid it in two payments. Q. Did you not tell me that he said that one was a $100 payment and the other a $150 payment? That is what I understood you. A. If I told you that, that is what he said. Q. Are you sure at this time as to the amount he did tell you? A. I think he did say that he paid it for $250. He paid it in two payments; that is what he told me."

When we consider the very cordial relation which is shown to exist between this witness and the accused we are of the opinion that his twice repeated statement that Christensen said he settled it for $300 corresponds very closely with the truth. However, if the statement of the accused is accepted as true, that he only received $250 and immediately loaned $150 of it to Christensen, still it does not place him in any better position than if he had kept the entire $250 himself. It is entirely clear that the money which was paid to the accused by Christensen on the account belonged to his client in Montana and that he merely held it in trust for remittance or subject to his client's order. If he did in fact loan Christensen $150 of the money so received, as he claims, it was a loan on his own account and for his own benefit, was without authority from and was a fraud upon his client and was a feloneous act under section 7464, Revised Codes, which reads as follows: "If any person being a trustee, banker, merchant, broker, attorney, agent, assignee in trust, receiver, executor, administrator or collector, or being otherwise entrusted with or having in his control property for the use of any other person, or for any public or benevolent purpose, fraudulently appropriates it to any use or purpose not in the due and lawful execution of his trust, or secretes it with a fraudulent intent to appropriate it to such use or purpose, he is guilty of embezzlement."

The facts as to this collection under any interpretation which may be given them also bring the conduct of the accused under section 428, Rev. Codes, which provides that "an attorney and counselor who is guilty of deceit or collusion, or consents thereto, with intent to deceive a court, judge or party to an action or proceeding is

liable to be disbarred and shall forfeit to the injured party treble damages, to be recovered in a civil action."

So also the continuance of the action by the accused for fully two years after the account was paid and for his own personal benefit, constituted a wilful violation of his duty as an attorney as prescribed by subdivisions 2 and 6 of section 427, Revised Codes, which duties are as follows: Subdivision 2. "To counsel and maintain no other actions, proceedings or defenses than those which appear to him legal and just, except the defense of a person charged with a public offense." Subdivision 6. "Not to encourage either the commencement or continuance of an action or proceeding from any motive of passion or interest." These violations of his duty were both willful and corrupt and constitute grounds for disbarment under subdivision 3, section 433, Revised Codes. In reaching a conclusion that the accused is guilty of the acts charged, in reference to this collection, we have occasion to look no further than to his letters, the receipted account and his oral admissions.

We will next consider the evidence as to the several alleged violations of his duty in connection with the unlawful sales of intoxicating liquors. All of these alleged breaches of duty were in his capacity as state's attorney of Stark county. The obligation which a state's attorney owes to the state is the subject of express legislative provisions which measure the duties of his employment. Some of the duties which are laid upon the accused under the prohibition law of this state, and the only one to which we need refer, are found in section 7604, Revised Codes, the same being a part of chapter 63 of the Penal Code, which relates to the unlawful dealing in intoxicating liquors. So far as pertinent it is as follows: "It shall be the duty of the state's attorneys diligently to prosecute any and all persons violating any of the provisions of this chapter, in their respective counties, and to bring suit upon all bonds or undertakings forfeited, immediately after the happening of such forfeitures, to recover the penalty, and to pay all money so collected, as herein provided, into the treasury of said county, and to take a receipt of the treasurer therefor. * * * If any state's attorney shall fail, neglect or refuse to perform faithfully any duty imposed upon him by this chapter, he shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined in any sum not less than one hundred nor more than five hundred dollars and be imprisoned in the county jail not less than thirty nor more than ninety days; and such conviction shall operate as a forfeiture of his office, and the court before whom such conviction may be had shall order and adjudge such forfeiture of office in addition to the fine imposed as herein provided." It is shown that in January, 1897, a number of persons in Dickinson, Stark county, were openly engaged in the business of unlawfully selling intoxicating liquors. On January 7th, 1897, the board of county commissioners of that county, adopted the following resolution: "Be it resolved by the board of county commissioners, of Stark county, North Dakota, that any person or

persons, company or corporation, desiring within this county now or hereafter while this shall be in force to engage in the business of dispensing liquid drinks, or keeping a place commonly resorted to for the purpose of drinking, shall first procure a license therefor as follows: To those engaged or desiring to engage therein within the town of Dickinson, including south Dickinson, they shall pay unto the county treasurer the sum of $40 per month, one-fourth in advance. To those thus engaged or hereafter to engage therein within said county and outside said town of Dickinson, the sum of $25 per month, one-fourth in advance. Provided, that any person, persons, company or corporation not engaged therein at this time, and who shall thus engage subsequent to the first day of April, 1897, shall pay the full license fee therefor from January 1st, 1897. Said license shall be issued by the county treasurer of said county and shall be approved by the chairman of the board of county commissioners and the said license shall be issued for three months and each quarter upon payment in advance of the required sum for the ensuing three months, shall be renewed by a written endorsement thereon, duly signed by the treasurer. The sums of money received by said source said treasurer shall, less the expense of enforcing said resolution as approved by the chairman of the board and attested by the state's attorney, be given into the general fund of the county at the beginning of each quarter. Passed January 7, 1897. W. A. McClure, Chairman. Attest: John Leask, County Auditor."

These licenses, it will be seen, by the express language of the resolution, extended to the "business of dispensing liquid drinks, or keeping a place commonly resorted to for the purpose of drinking." This language quite accurately describes the public saloon. But aside from this it is entirely clear under the evidence that the license was understood and intended to cover the sale of intoxicating liquors. It is shown that under the system inaugurated by the foregoing resolution, during the months of January, February, March, April, May, June, and July, of that year, altogether eleven different persons took out licenses and paid money to the county treasurer. All of the persons named in the accusation as being engaged in the saloon business, except Berry, are shown by the treasurer's record to have paid the license fee exacted by the foregoing resolution, and Berry testifies that he paid license, but the treasurer's record does not so show. It shows that $1,540 was paid in and names the persons from whom it was received. This sum was disbursed by the treasurer as follows: For printing, $7.50; to Charles Kono, $8; to Leslie A. Simpson, $619.50, the latter being in five payments; $905 was turned into the general county fund. On September 25, 1895, the accused published the following letter in the Dickinson Press over his own signature, evidently in justification of the course pursued by him and the county commissioners in licensing such unlawful business, which evidently had become a subject of criticism:

"Mr. Simpson's Statement: Dickinson, North Dakota, Sept. 22, 1897. To the Editor of the Press: As the editor of the Recorder

for several weeks with a persistency worthy of a better cause, has been publishing a series of absolute falsehoods relative to the proceedings of the county commissioners and myself as state's attorney, regarding the issuance of licenses to persons in the county engaged in dispensing liquid drinks, and as the said editor has given publicity to the petition which reflects upon the commissioners and myself, I deem it not out of place to make a few statements of the facts which the Recorder ignores relative to the matter. Before the places in question were granted licenses a petition directed to the county commissioners and myself and signed by about 400 taxpayers in the county, besides other men who were at that time engaged in business in Dickinson, with one exception, was presented asking that persons engaged in the business of selling liquid drinks, using the words of the petition, be required to pay a license. * *' * This petition was signed by the editor himself and may be seen at my office with the signatures. It was in response to this petition, so liberally signed, that the places were licensed. Under that system the $1,825 have been paid in. Of this $547.50 has been paid to the county treasurer and state's attorney for collecting same, so that by deducting 25 per cent of the total collected, the balance of $1,277.50 less about $15 for expenses goes to the county, and is now in the hands of the county treasurer. Those sufficiently interested may verify these facts by going to the county treasurer's office. The figures published in the Recorder and named in the petition are false. They were known to be false when published. In the meantime the county treasury is richer by a sum sufficient to pay the total year's salary of the clerk of court and state's attorney, and half the salary of the county superintendent with only six month's collections, and that is from a source from which the county never before received a cent. If the license is wrong a majority of the voters have asked for it and the commissioners are carrying out their wishes in the matter. The county commissioners and state's attorney are large taxpayers and each one is individually interested in the welfare of the county. (Signed) Respectfully, L. A. Simpson."

The evidence is conclusive and in fact it is not disputed that the places licensed were public saloons, and it is also entirely convincing that the accused knew their real character and that the words "liquid drinks" used in the resolution and licenses were intended to mean intoxicating liquors. It is clear that the various parties paid their money for the purpose of being allowed to sell intoxicating liquors and that it was received for that purpose. But were we able to ignore the evidence on this point and conclude that the licenses issued extended only to a lawful business and adopt the further legal absurdity that the county could exact a license fee for conducting such lawful business, and that these various sums of money were lawfully paid to and received by the county, still such concession would not make the act of the accused in exacting 25 per cent commission lawful. The salary of the state's attorneys is fixed

by section 2058, Revised Codes, and he is prohibited by section 1983, Revised Codes, from receiving any fee or reward for any services or business to which it shall be his duty to attend. The exaction of the sums of money from the county, which the accused is shown to have received, would in that event be unlawful and he would be subject to removal from office under section 7838, Revised Codes, providing for the removal of officers for charging and collecting illegal fees. The direct connection of the accused with these unlawful acts is shown by the undisputed evidence that he went with two of the county commissioners and presented a copy of the resolution before set out, to one or more of the persons engaged in such unlawful business and threatened to prosecute them unless the license fee so exacted was paid. Pisha testifies that he paid his license fee direct to the accused and received his license from him personally. It seems that in July, 1897, the county officers refused to be further connected with the license system or to receive money from the persons engaged in such unlawful business. Thereafter and on December 29th, Simpson made affidavits accusing the various persons named in the accusation as engaged in such unlawful business with conducting saloons wherein intoxicating liquors were sold contrary to the law of this state, and also verified complaints in each of the actions, which complaints set out such violations in detail. Injunctions and search warrants were issued against these several places and the sheriff of Stark county closed such places thereunder. Early in the next month, January, 1898, and while their places were still closed, a number of the persons whose places had been closed by the proceedings referred to, held a meeting in the office of the accused for the purpose of arranging about opening again and resuming business. Several of the persons present at that meeting seemed to have no distinct recollection of the occasion which called them there, or what occurred. Two of them, however, have,—Pisha and McGinley,—and they have given an intelligent version of what transpired, and it has not been contradicted by the accused. Michael McGinley says he was present and that the purpose of the meeting was to "try and make arrangements to open these places again." "I think the proposition was that we pay $50 a month for the privilege of opening again." "So far as I understood Frank Kihm was to do the collecting." "The money to be paid was for the same purpose as was paid to the county officers." "They had made arrangements to have him (Kihm) as collector of this money which was supposed to be for the permission to sell liquid drinks in the town of Dickinson." "It was simply said that the person who wanted to sell liquid drinks should pay Mr. Kihm $50, but it was not disclosed by the meeting what he was to do with it." "I supposed it was a fund to be raised from all the houses." "It was to help the thing along I believe." "Yes, I believe I asked Mr. Simpson myself, as I remember it, what was to be done with it and he said it was to go of course to the county after the expenses of collecting was taken out." "As I understood

it he (Simpson) was to get 25 per cent. of the whole of it." Pisha's testimony as to the arrangement made at the meeting for opening their places of business corresponds with that of McGinley before set out. Pisha says: "We were called in at the meeting for the purpose of opening up a new place again in a new style for $50 a month." "I understood it was put up to Mr. Simpson for letting us run the business again." "He (Simpson) said he would not collect the money. He says he dasent but if we wants to run business we should elect a collector ourselves, the collector give us a receipt for the money he collects for Simpson. That is the way I understood." "He (Simpson) says we put up the money $150 for three months. He would protect us and we would not be pulled at all. Who didn't put up $150 he would be pulled." "The talk was between us (Kihm, Berry and Pisha when the money was paid). We paid the money to Kihm. He is collector and he give us receipt and we be protected from Simpson. That means we pay him $150 and we can go ahead in business; he would not bother us any more." "Mr. Simpson says any man comes here and open up a saloon and if he has not paid $150 he close him up." "I asked him if it comes somebody from these big offices from below, Fargo or Bismarck up here. He says no trouble comes here against selling. He says they would write to him, to the county attorney, and he says I am all right with those officers, and he is general assistant deputy," meaning assistant attorney general. In pursuance of such agreement Pisha gave to the Frank Kihm referred to, a check for $150 on February 3, 1898, and received his written receipt therefor. The check was cashed and both the check and receipt are in evidence. He also paid him the further sum of $50 on May 3, 1898, for the same purpose and received a written receipt which is also in evidence.

E. J. Berry, who was also closed up by the injunctional proceedings referred to, was at the meeting in Simpson's office. He not only testifies to paying the county treasurer for licenses during the license period, but in reference to the meeting in Simpson's office says: "We was there to straighten up the injunction cases. It was in connection with that that I went there to meet the sheriff," who he says was there also.

"Q. Now after your injunction was dissolved did you put up any money for the privilege of running your place? A. Yes sir, and still pay for privileges. Q. Up to this present time? A. Yes sir. Q. You never paid Mr. Kihm? A. Yes, I paid Mr. Kihm $75 on two occasions. Q. For what consideration did you pay him? A. For him to use what influence he had to arrange in opening our places of business. Q. That was after you had been closed up? A. Yes sir. Q. After the injunction was dissolved?" A. Yes sir. Q. And about the time you opened up again? A. Yes sir. Q. How did you fix $75?" A. We arranged among ourselves that by the use of so much money the chances were that we could run our places."

Simpson's active connection with the maintenance of such unlaw-

ful business is perhaps sufficiently shown by the foregoing evidence, but there is further evidence in the record of his actual knowledge of the character of these places. It appears that in the spring of 1898 the accused joined the volunteer troops from this state and was absent from his office at Chickamauga Park for several months. He left his office in charge of one William Thaw Denniston, who is one of his accusers. Denniston testifies that Mr. Kihm came to Simpson's office when he was there and that "he (Kihm) said he had some money for me or for Mr. Simpson. I told him to make a statement of the items and the amounts so that I could forward them to Mr. Simpson and he could either deposit the money in the bank to Mr. Simpson's credit or give it to me and I would do so. He refused to make any note of the items and after some time he finally told me this money was $200; that it was for payment for protection from four places for selling intoxicating liquors in Dickinson for which he was collector and he said he wanted or they wanted these two new places closed up. Then I told him to bring complaint. He refused and said as they were paying heavy protection they thought they were entitled to have protection, and he said there were four of them running and paying $50 per month and that he was, so to speak, collector for the four. I do not remember whether he used the word collector or not but he said that in substance. I told him that I would take no action in the matter but that I would write to Mr. Simpson immediately and tell him the facts and that Mr. Simpson could do as he pleased." Denniston testifies that he did write the substance of the foregoing to Mr. Simpson and produced a letter written by the latter from Chickamauga Park which is, in part, as follows: "Dear Denniston: * * * I do not know what Kihm has told you as you did not state. So far as the 'liquid drink' places are concerned, four are all I propose to have run there (or five at the outside) while I am prosecuting attorney. If any more start I want injunctions issued against them. The prohibition blanks are in my office. * * *" This letter is in evidence and the accused admitted upon his cross-examination that he wrote it. The fact that the accused directed Mr. Denniston to proceed against such "liquid drink" places as should start, beside the favored four or five, under the provisions of the prohibition law, clearly shows that the expression "liquid drink places" had a local signification in Dickinson and was intended to designate what is known in states where the business is lawful as saloons. It is shown that after the meeting in Simpson's office these places re-opened and continued business as before. Three at least are shown to have moved their saloon fixtures from one side of the building to the other and there is evidence that this was done at Simpson's direction and that in one or more instances he stated that the injunctions covered but a part of the building. Just what legal steps were taken to open the buildings is not clear. Some of the witnesses testified to giving bonds and paying costs. The accused

states that bonds were given and orders were obtained from the judge of the District Court for Stark county dissolving the injunctions. We think it is an established fact that bonds were given by some if not by all the defendants in the action. None of the original papers appear to be in existence. None of them were filed in the clerk's office and there is no public record of the payment of the costs in any of the cases or that any such cases ever were in existence. The judge of the District Court was called as a witness for the accused and it is significant that he was not questioned as to the issuance of any orders of any kind in any of these cases. The accused obtained possession of the copy served upon Kihm and it appears that with one exception the other copies were lost. Mr. Simpson states that he turned over all of the orginal papers to Frank P. Stone, deputy sheriff of Stark county, when he joined the army, some months after they were served and that he has not seen them since. The latter states that he took the papers to his house and put them in a bureau drawer. When required by a subpoena to produce them he reported that they could not be found. A similar condition exists as to other records relating to the license period. The license resolution passed by the county commissioners was not spread upon the minutes of their proceedings, but was committed to a separate paper which is now lost. The records of the county treasurer's office showing the receipts and disbursements under the resolution were kept in a small book unknown to the regular county records; that book is also lost. The funds were disbursed under a special form of warrant; all of these warrants are also lost. The licenses issued and receipts for payments are, with one or two exceptions, lost. Not only has there been a general disappearance of documentary evidence relating to these unlawful acts, but there is also a marked failure of memory on the part of the persons connected with them. Sufficient facts have been shown, however, to make it clear that the accused not only violated his duty under section 7604, supra, by failing to prosecute, but that he willfully, corruptly and actively encouraged violations of the very law which he was bound as state's attorney to enforce, and these from purely mercenary motives; and, further, that the injunctional proceedings were instituted by him, not with a view to permanently discontinue sales of intoxicating liquors, but for the purpose of exacting further revenue from the persons engaged in such unlawful business. The legislature has denominated these acts as a misdemeanor under section 7604, supra, and in addition to forfeiture of office has affixed the further penalty of fine and imprisonment. The acts constituting such misdemeanor involve moral turpitude and are grounds for disbarment under subdivision 1 of section 433, Revised Codes.

The facts established give us no discretion in passing judgment. The acts done by the accused were knowingly and corruptly committed by him. He is shown to have been willfully false to a private client and to the state as state's attorney. His general atti-

tude toward the administration of justice and his conduct as an attorney have come under our immediate observation during the progress of these proceedings and both confirm the conclusion that he lacks that high sense of personal and professional integrity which is a paramount qualification in an attorney and counselor-at-law. His answer to the charges is evasive and does not speak the truth. The statement that the Christensen settlement "was in every way to the interest of his client and to his client's satisfaction, then and now, and that in all things connected therewith he was faithful to his client's interests" is shown by the deposition of James Donovan to be entirely false. Neither has he aided the court in its efforts to ascertain the truth in any stage of the proceedings. His attitude, on the contrary, has been to conceal and suppress the facts. Donovan testifies that the accused called on him at Great Falls on January 11th of the present year. "He asked me not to testify against him in this matter. He stated that I could refuse to obey the notice or subpoena to testify if I so desired." There is evidence also that he advised one or more of the witnesses for the prosecution at Dickinson that they need not obey the subpoena of the referee, and the referee's record shows that in several instances when the witnesses for the prosecution were being examined in chief the accused interfered and instructed such witnesses that they could decline to answer. His treatment of opposing counsel and witnesses has been presistently and grossly insulting. In two instances his language in reference to two witnesses before the referee is too indecently vile to be reproduced. In his answer and at various times during the proceedings he asserted that Denniston had taken from his office various papers which he was unable to produce at the request of the prosecution. These accusations were without excuse or provocation. There is no evidence that such papers were taken by Mr. Denniston and no reason is given for even a suspicion that such was the case.

It is urged that the motive which prompted the accusers to file the accusations was personal. That may be true, but it does not weaken the force of the facts proved or alter our duty with regard to them. We may say, however, that the facts proved fully justify their course and that in calling the court's attention to the gross misconduct of one of its officers they were acting strictly in the line of duty.

A number of witnesses have testified to the good standing of the accused at the bar in his judicial district, including witnesses from Stark, Billings, and Burleigh counties. Some of them are lawyers, others men of prominence in public affairs. If the evidence was doubtful or if the unlawful acts which the accused has committed could be excused on the ground of ignorance or mistake such evidence of reputation would have great weight, but under the facts as we find them evidence of reputation cannot be permitted to prevail against the gross violations of duty of which the defendant has been guilty. So, too, the accused has produced a number of witnesses

who attack the veracity and professional standing of Mr. Denniston, one of the accusers. This evidence is also unimportant, as the unprofessional acts alleged to have been committed by the accused are clearly established without the evidence of the latter, and it need not be further referred to. ·Proof of the good professional standing of the accused in his judicial district or of the bad reputation of Mr. Denniston, cannot remove the corrupt character of the offenses of which he has been guilty. Neither can it avert the severe penalty which the law attaches to such misconduct.

A preliminary motion was made to quash this proceeding upon the ground that this court is denied original jurisdiction to entertain it under section 86 and 87 of 'the state constitution. We are entirely clear that a disbarment proceeding is not within the spirit and meaning of the constitutional inhibition contained in the sections referred to. The power to discipline attorneys, who are officers of the court, is an inherent and incidental power in courts of record, and one which is essential to an orderly discharge of judicial functions. To deny its existence is equivalent to a declaration that the conduct of attorneys towards courts and clients is not subject to restraint. Such a view is without support in any respectable authority and cannot be tolerated. Any court having the right to admit attorneys to practice, and in this state that power is vested in this court, has the inherent right in the exercise of a sound judicial discretion, to exclude them from practice. The statutory provision found in section 432, Revised Codes, authorizing this court to suspend or disbar an attorney for unprofessional conduct is merely a legislative affirmance of a power which already existed. In support of the foregoing see: *Ex parte Wall,* 107 U. S. 265, 27 L. Ed. 552; 2 S. C. Rep. 569; *In re Mills,* 1 Mich. 392; *People* v. *Ford,* 54 Ill. 520; *In re Secombe,* 19 How. (U.S.) 9, 15 L. Ed. 565; *In re Garland,* 4 Wall. 333, 18 L. Ed. 366, and numerous cases cited in 6 Enc. Pl. & Pr., on pages 711 and 712.

It is also well settled that an appellate court possesses the power by an original proceeding to suspend or disbar an attorney for unprofessional conduct in a lower court. So also a state court may discipline counsel for unprofessional acts committed in the federal courts. On this point see cases cited in 3 Am. & Eng. Enc. L. (2d Ed.) pages 300 and 301, and note, and this inherent power in the judiciary cannot be defeated by the legislative or executive departments.

The judgment of the court is that the license of the accused to practice in the courts of this state be, and the same is hereby revoked and canceled, and the clerk of this court is directed to strike his name from the roll of attorneys.